OPINION OF THE COURT
Margarita López Torres, S.
In 2003, the State Commission on Judicial Conduct filed a disciplinary complaint against Michael Feinberg, the then-Surrogate for Kings County, concerning his conduct in awarding some $8,613,009.35 in legal fees to Louis R. Rosenthal, the then-counsel to the Public Administrator for Kings County, which resulted in a determination that Surrogate Feinberg be removed from office, a decision subsequently upheld by the Court of Appeals. (Matter of Feinberg, 5 NY3d 206 [2005].) Subsequent disciplinary proceedings arising from their conduct in this regard resulted in the disbarment of the former Surrogate and the suspension of the former counsel from the practice of law. (Matter of Feinberg, 57 AD3d 1087 [3d Dept 2008]; Matter of Rosenthal, 57 AD3d 1085 [3d Dept 2008].)
*313 The Attorney General of the State of New York now moves, pursuant to CPLR 5015, to vacate those portions of the final decrees issued in the above-captioned 88 proceedings which set and determined the legal fees for Rosenthal while he was counsel to the Public Administrator.[1] The motions have been consolidated for decision and order.
The decrees in these proceedings were issued at various times between January 1, 1997 and May 31, 2002. The Attorney General asserts that in each of these cases the legal fees paid to Rosenthal equaled approximately eight percent of the value of the estate, regardless of the legal services actually performed by Rosenthal. The Attorney General asserts that, in setting the legal fees to be paid to Rosenthal, then-Surrogate Feinberg failed to abide by the requirements of SCPA 1108 (2) (c). That section states:
“Any legal fees allowed by the court pursuant to [SCPA 1108 (2) (b)] shall be supported by an affidavit of legal services setting forth in detail the services rendered, the time spent, and the method or basis by which requested compensation was determined. In fixing the legal fees, the court shall consider the time and labor required, the difficulty of the questions involved, the skill required to handle the problems presented, the lawyer’s experience, ability and reputation, the amount involved and benefit resulting to the estate from the services, the customary fee charged by the bar for similar services, the contingency or certainty of compensation, the results obtained, and the responsibility involved.” (Emphasis added.)
The Attorney General asserts that during the 51/2 years during which these decrees were issued, Rosenthal never submitted — and then-Surrogate Feinberg never required — affidavits of legal services to support any of the legal fees Rosenthal charged to the subject estates. Based on these alleged facts, the Attorney General seeks (i) the issuance of amended decrees in each of these matters consistent with the criteria set forth in SCPA 1108 (2) (c), and (ii) the return to such estates of all amounts that Rosenthal received in excess of the value of the legal services he rendered.
*314 The submission and consideration of an affidavit of legal services when setting legal fees of the counsel to the Public Administrator is mandatory. (SCPA 1108 [2] [c].) “The statutory requirements of an affidavit and specification of factors the surrogate must consider when fixing the fee offer assurance that the amount paid out of an estate — and therefore not available as a distribution to beneficiaries — reflects the true and reasonable cost of the services rendered.” (Matter of Feinberg, 5 NY3d at 210.) During the period in which the subject decrees were issued, then-Surrogate Feinberg “never required Rosenthal to submit an affidavit of legal services before approving a fee request, nor did he determine fees based on consideration of the statutory factors specified in SCPA 1108 (2) (c).” (Id. at 212.) Instead, at the conclusion of the accounting in each estate Rosenthal was awarded a fee which was “generally eight percent . . . of the total value of the estate.” (Id.)[2] Clearly, then-Surrogate Feinberg did not apply SCPA 1108 (2) (c) in initially setting Rosenthal’s fees in these estates during the relevant time period.
Rosenthal subsequently submitted purported affidavits of legal services for his work on the subject estates, but only after the decrees had already been issued. “In the spring of 2002, when [then-Surrogate Feinberg] learned of an impending newspaper expose of his office, he directed Rosenthal to submit affidavits of legal services, nunc pro tunc, all of which he approved without [adjusting any of the previously fixed fees].” (Matter of Feinberg, 57 AD3d at 1088.) Thus, while the court’s files on the subject estates now contain papers designated as affidavits of legal services, these filings were nothing more than an attempt to comply retroactively with the form of the statute. Yet the intent and purpose of the statute — to allow only those fees which are. reasonable, based on an individualized consider *315 ation of the actual work performed, prior to fees being awarded — remains unrealized.
The Attorney General concedes that while it appeared in each of the proceedings at issue, it never filed objections with regard to Rosenthal’s fees. This is indeed troubling, since it appears that, as early as 1988, the Attorney General was aware that the Public Administrator’s counsel may have been receiving more legal fees than were appropriate. “[T]he Attorney General twice in the past attempted to rein in counsel fees approved by the Kings County Surrogate, reaching agreements in 1988 and 1994 with then-counsel to limit fee awards to six percent of an estate’s value, with additional payment only in special cases.” (Matter of Feinberg, 5 NY3d at 210.)
Clearly, the Attorney General was well aware of troubling issues relating to compensation paid to the Public Administrator’s counsel for the administration of estates prior to the period during which the relevant decrees were issued. Indeed, in at least four cases, the Attorney General filed objections regarding legal fees and arrived at compensation agreements with Rosenthal’s predecessor. However, when Rosenthal became counsel to the Public Administrator only two years after the last such agreement, the Attorney General continued to appear in the proceedings at issue but failed to object to the approximately eight percent legal fees being paid to Rosenthal from the subject estates. Notably, Rosenthal asserts — and the Attorney General does not deny — that even after he filed the nunc pro tunc affidavits, the Attorney General, upon whom such affidavits were served, met with the then-Surrogate and Rosenthal, yet filed no objection to the fees which had been paid in the subject estates.
Now, the Attorney General seeks to vacate those portions of the subject decrees that set Rosenthal’s legal fees some 13 years after the earliest, and eight years after the most recent, of these decrees were issued, and four years after then-Surrogate Feinberg was removed from the bench. The motion is predicated on, inter alia, CPLR 5015 (a) (3) and the court’s inherent authority to modify or vacate its own decrees. As such, it may be entertained despite the Attorney General’s failure to file objections when the subject decrees were issued.
CPLR 5015 (a) (3) allows a court to vacate a decree if the record reflects “fraud, misrepresentation, or other misconduct of an adverse party.” Additionally, it is well established that a court “has the inherent authority to vacate its own order ‘for sufficient reason, in the furtherance of justice.’ ” (Bellevue *316 Santiago v City Ready Mix, 270 AD2d 441 [2d Dept 2000], quoting Ladd v Stevenson, 112 NY 325, 332 [1889].) While the Attorney General may have tacitly consented to the submission of the nunc pro tunc affidavits, this court retains the authority to review the propriety of such submissions. The presumption that the nunc pro tunc affidavits were in fact considered by then-Surrogate Feinberg when approving all of Rosenthal’s fees unchanged, is untenable, particularly given the circumstances in which such affidavits were filed. Such actions will not be condoned. Indeed, despite the filing of the affidavits after the fees had been fixed, the Appellate Division found that Rosenthal “charged excessive fees over a five-year period, collected the fees in violation of a clear statutory mandate designed to protect the funds of the estates he was representing, and the total fees collected were substantial.” (Matter of Rosenthal, 57 AD3d at 1086.) The facts as set forth in the decisions of the Court of Appeals and the Appellate Division, Third Department militate against according the nunc pro tunc affidavits any legitimacy.
The record establishes — and the Court of Appeals has already ruled — that Rosenthal’s fees were initially fixed by then-Surrogate Feinberg without the consideration of any affidavits of legal services. Rosenthal asserts that this defect was cured by the subsequent filing of affidavits of legal services nunc pro tunc, which affidavits were accepted by then-Surrogate Feinberg. Although after the submission of these affidavits, “not a single fee was adjusted by the Surrogate” (Matter of Rosenthal, 57 AD3d at 1086), Rosenthal nonetheless proffers the “presumption of regularity”[3] and asserts that “there can be no implication that Judge Feinberg did not review [the nunc pro tunc affidavits] or review them properly.” (Aff in opposition 1Í 42.) However, the decisions in Matter of Feinberg (5 NY3d 206 [2005] [accepting the recommendation of the Commission on Judicial Conduct that then-Surrogate Feinberg should be removed from office]) and Matter of Feinberg (57 AD3d 1087 [2008] [disbarring then-Surrogate Feinberg for his conduct]) delineate and are founded upon the very irregularities and omis *317 sions of the Surrogate in setting the subject fees during the relevant time period. Indeed, the Court of Appeals found that the record in the underlying proceeding “reflected] not mere lapses or errors in judgment but a wholesale failure of [then-Surrogate Feinberg’s] duty.” (Matter of Feinberg, 5 NY3d at 216.)
Furthermore, a review of the nunc pro tunc affidavits reveals that none contain any particularized description of the legal services performed in each estate. Instead, the language in each affidavit is essentially identical — a boilerplate description of the duties of the Public Administrator’s counsel — and thus could not have aided the required individualized consideration of the propriety of the fees to be awarded in each case, even if, hypothetically, the affidavits had been submitted properly before the initial fee decrees. Any assertion that SCPA 1108 was ever applied is further undermined by Rosenthal’s claim that no affidavits were submitted initially and the fees were set at the eight percent figure because that had been the historical pattern and practice in Kangs County.
A court may vacate a decree upon the application of any person, if in its discretion, such relief is necessary to further justice. (McMahon v City of New York, 105 AD2d 101 [1st Dept 1984]; Matter of Jericho Union Free School Dist. No. 15, Town of Oyster Bay v Board of Assessors of County of Nassau, 131 AD2d 482 [2d Dept 1987].) That an estate not be diminished to the detriment of distributees is foremost among the concerns of this court and there is “no assurance that the [subject] estates benefitted in proportion to the amounts they were charged [in violation of] the clear legal requirement and legislative intent of SCPA 1108 (2) (c).” (Matter of Feinberg, 5 NY3d at 214.)
The court is not foreclosed, as Rosenthal argues, from vacating decrees in which next of kin were located. While the Attorney General may have appeared in such proceedings pursuant to SCPA 316 because at some time during administration of such estates no distributees had been identified, the Attorney General’s standing is not limited by SCPA 316. Both the language of CPLR 5015 and related precedent regarding the vacatur of judgments allow “any person” to move a court to modify or vacate a judgment in the interests of justice.[4] Such concerns are particularly apt here, since “[t]he purpose of the statutory affidavit and individualized consideration require *318 ments is to ensure that beneficiaries of estates that, by definition, lack interested parties capable of offering independent review are paying only for the actual cost of administering the estates.” (Matter of Feinberg, 5 NY3d at 214.) Thus, “[t]o seek relief from a judgment or order, all that is necessary is that some legitimate interest of the moving party will be served and that judicial assistance will avoid injustice.” (Oppenheimer v Westcott, 47 NY2d 595, 602 [1979].) It is well established that CPLR 5015 “was intended to assure that a broad class of persons, not limited to parties in the formal sense, could move in the original action on grounds vastly broader than permitted at common law or under prior practice” (id. at 603). Here, if legal fees are not fixed based on the actual work performed, there is no question that an injustice results, as the subject estates have been diminished without regard to the benefits conferred upon them by Rosenthal’s legal services. Additionally, the court may assert its authority over a decree if it is demonstrated that irregularities existed in its issuance. That standard is satisfied under the facts presented.
Based on the foregoing, the Attorney General’s motion is granted to the following extent. The portions of each decree in the above-captioned estates which fixed the legal fees for Louis R. Rosenthal are vacated. Louis R. Rosenthal shall file affidavits detailing the legal services he provided in each of the respective subject estates within 90 days of the service upon his counsel of a copy of this decision and order with notice of entry. Pursuant to SCPA 1108 (2) (c), the affidavits shall set “forth in detail the services rendered, the time spent, and the method or basis by which [the] requested compensation was determined.” Upon due consideration of such affidavits, the court shall issue decisions and orders as necessary in each of the subject estates, and shall direct the settlement of any amended decrees. The foregoing constitutes the decision and order of the court.
It should be evident from the foregoing that, unfortunately, the final resolution of the fee issues arising from these 88 cases will remain pending for some time to come. Indeed, the problems generated by the conduct of Rosenthal and then-Surrogate Feinberg have already consumed an enormous amount of time and resources of this court, as well as that of the appellate courts, the Attorney General’s office, and other agencies. Moreover, and more significantly, these events “eroded public confidence in the integrity of the Judiciary.” (Matter of Feinberg, 57 AD3d at 1088.) This court would be remiss if it *319 failed to note that the issues concerning not just the fees paid to private counsel to the Public Administrator, but also concerning the fundamental lack of oversight of such process, arising from the inherent structural problems which contributed to this debacle, have been present and known for quite some time.
As a threshold matter, it should be stressed that the public administrators of the five counties of the City of New York are commissioners of the City; they are not employees of the courts. Pursuant to SCPA 1105 (3), their salaries are paid by the City, and such expenses must be included in the City’s annual budget. The public administrators’ staff are also city employees whose salaries are paid by the City. All commissions received by each commissioner must be deposited in the City’s treasury each month and the City Comptroller may demand that each commissioner produce all bank statements, vouchers, and any other documents of the public administrators’ offices at any time. (SCPA 1107.) Additionally, until 1993, each commissioner was required to file monthly reports only with the City’s Mayor and Comptroller. In 1993, SCPA 1109 was amended to also require the filing of such reports with the surrogate of the county in which a public administrator was located. (L 1993, ch 655.) Pursuant to SCPA 1110, the City is answerable for each commissioner’s faithful execution of his office, the City has complete authority to make any lawful deductions from the public administrator’s commissions, and it is the City that is financially liable for any misconduct or negligence by its commissioners.
Despite the foregoing, the City’s public administrator in each county is appointed by the surrogate or surrogates of that county pursuant to SCPA 1102, and only the surrogate or surrogates may remove the City’s public administrator. The City, therefore, although liable for all of a public administrator’s acts, may not appoint or remove any public administrator. Additionally, while other city agencies are represented in court proceedings by the City’s own Corporation Counsel, in Surrogate’s Court the City’s public administrators are represented by private counsel appointed by the court pursuant to SCPA 1108 (2) (a). And while attorneys for Corporation Counsel are salaried employees of the City, each commissioner’s counsel in Surrogate’s proceedings are paid by the estates of decedents in such amounts as are determined appropriate by the surrogates.
Thus, there exists the anomaly of a surrogate, a member of the State’s judicial branch, appointing a public administrator, a member of the City’s executive branch, rather than the Mayor, *320 who appoints all other city commissioners. This statutory scheme has resulted in an untenable system of diffused accountability that has, time and again, been proved to ill-serve the public interest. While the public administrator is an agency of the City, the City has never committed to any ongoing routine oversight over its own commissioners.[5] Indeed, not many years ago, in a title VII action alleging sexual harassment by a deputy public administrator, the City moved to dismiss the complaint, asserting that an employee of its own deputy commissioner should not be considered a city employee, as the deputy public administrator is appointed by the surrogate. (Gryga v Ganzman, 991 F Supp 105 [ED NY 1998].) That court, finding that the City was indeed the employer of the public administrator’s staff as a matter of law, denied the motion. (Id. at 111.)
The result is a municipal agency whose relationship to the City is akin to that of a neglected stepchild. The surrogates themselves, as judicial officers, should not and cannot become closely involved in the oversight of a litigant who frequently appears before them. For a judge to review the records and day-today affairs of the public administrator would necessarily require gaining extrajudicial personal knowledge of the facts of a case. To do so becomes ethically problematic where the judge is called upon to rule in cases of which she or he has prior personal knowledge of the estate’s affairs and may have even directed the conduct of the fiduciary. (See 22 NYCRR 100.3 [E] [1] [a] [ii] [requiring a judge to disqualify herself if she has personal knowledge of disputed facts concerning the proceeding].) When one considers that the public administrators’ counsel are also appointed by the surrogate or surrogates, the matter becomes even more problematic.[6] If the very judge who decides what legal fees shall be paid to the public administrator’s counsel is also involved, directly or indirectly, in determining the actions of the litigant, then the impartial judicial role is further compromised.
That the present statutory scheme creates a structurally unworkable system that is open to abuse is certainly not mere conjecture. Leaving aside the events that resulted in the neces *321 sity of the instant motions, for almost a century the flaws of a system by which the surrogate appoints the public administrator and the public administrator’s counsel has resulted — in all five counties of the City — in repeated incidents that have attained notoriety in the news media and surely have not enhanced the public’s perceptions of either office.
This court’s analysis of the structural problems of the current arrangement is hardly novel, however. As long ago as 1987, the Attorney General and the State Comptroller issued a report which summarized the problem with the current system:
“we believe that a Surrogate’s direct involvement in the management of a [public administrator] office is extremely problematic. Any objections by interested parties challenging the methods and conduct of the [public administrator] in administering a particular estate are made before the local Surrogate, and it is the Surrogate who must ultimately pass upon these objections in the course of reviewing the [public administrator’s] final accounting. Where the Surrogate has closely supervised the [public administrator] and has played a direct role in the formulation of office policy, his impartiality in assessing objections to the [public administrator’s] procedures or conduct is inevitably open to question. . . .
“The hint of a conflict of interest or the suggestion of a possible bias undermines public confidence in the fundamental fairness of the judicial process. At the very least, the present [public administrator] appointment scheme places the Surrogate in the dubious position of ‘hiring’ a public official who is a frequent party before him and whose conduct — as the Surrogate’s appointee and subordinate — may be the subject of legal proceedings that the Surrogate must determine.” (New York City Public Administrators: An Operational Review, at 54 [Nov. 1987] [on file with the New York State Library].)
That report urged the following remedial recommendations:
“[T]he power to appoint [public administrators] should be transferred from the local Surrogates to New York City government. Because the [public administrator] frequently appears before the Surrogate of his county as a party to legal proceedings and because the Surrogate ultimately must pass upon challenges to the [public administrator’s] fidu *322 ciary conduct and policies in any estate matter, it seems to us inappropriate for the Surrogate to appoint and supervise the [public administrator]. In addition to eliminating any appearance of a conflict in the Surrogates’ roles under the present appointment scheme, the proposed transfer of appointing authority would squarely place the ultimate responsibility for a properly run New York City system in the executive branch of the local government that controls the [public administrator] office budgets, ending the present bifurcation of appointing authority and funding responsibility. Furthermore, we believe that centralizing appointing authority and oversight in municipal government will enhance the likelihood that the [public administrators] adopt efficient and uniform procedures for the discharge of their responsibilities. Finally, we note that this transfer of appointing authority to the city will allow the City’s Department of Investigations to investigate any allegations of misconduct.” (Id. at ES-9.)
Despite the issuance of this report nearly a quarter-century ago, and the significant disruption to the administration of justice as a result of the matters detailed in Matter of Feinberg and Matter of Rosenthal, there appears to have been no action at the municipal or state level to pursue the report’s recommendation of vesting responsibility in the City for the actual oversight of its own offices.[7] Yet there appears to be no compelling reason why city commissioners in this single instance need be appointed by someone other than the municipal government or why, in this single instance, private counsel are appointed to represent a city commissioner in court proceedings. Indeed, the Attorney General and Comptroller also recommended that the public administrators “be required to employ salaried staff counsel and staff accountants to provide these professional services more economically.” (Id.)
In sum, the unfortunate circumstances that have resulted in the necessity for the instant motions should be a clarion call for the City and the Legislature to give appropriate consideration *323 now to reforming the current troubled system. It is this court’s view that the City needs to take responsibility for the oversight and operation of its own agency, in the same fashion as its other agencies. Additionally, a legislative change requiring the Mayor to appoint the public administrator and designate either in-house counsel or the Corporation Counsel to perform that agency’s legal work would not only enhance the independence and impartiality of the surrogate’s courts in cases involving the public administrator, such a change would provide this vital city agency with appropriate supervision.

. The Attorney General moved for the same relief in a number of other estates before Surrogate Diana A. Johnson. That court granted the motions to the extent discussed in the decision and order therein. (See Matter of Adelson, 25 Misc 3d 1215[A], 2009 NY Slip Op 52136[U] [Sur Ct, Kings County 2009].)

. “[I]n 1993 the Legislature created an administrative board empowered to ‘establish guidelines and uniform fee schedules for the operation of the offices of public administrators’ (SCPA 1128 [2]). While the board has no oversight responsibility with regard to the appointment of counsel or payment of fees for legal services, in October 2002 [the board issued guidelines for] a uniform fee schedule for the counsels to the New York City public administrators — setting a sliding scale of maximum legal fees based on six percent of the estate’s value for the first $750,000, with decreasing percentages charged for estates in inverse proportion to the estate’s size beyond the initial $750,000.” (Matter of Feinberg, 5 NY3d at 211.)

. “In the absence of any specific proof, the law presumes that the statutory requirements were satisfied. Under this ‘presumption of regularity’ the law further presumes that no official or person acting under an oath of office will do anything contrary to his official duty, or omit anything which his official duty requires to be done.” (People v Dominique, 90 NY2d 880, 881 [1997].)

. The enormous time and effort entailed in the Attorney General’s review of untold numbers of Public Administrator accountings over the 572 years at issue must be recognized.

. While the City Comptroller does perform audits of the public administrator of each county every four years, there remains a systemic failure to supervise on the City’s part.

. This is entirely unlike the process utilized for the appointment of counsel for indigent or incompetent persons, where judges in each such case choose randomly from a panel of attorneys prequalified by the Appellate Division.

. To its credit, the Office of Court Administration has sought to ameliorate the situation by requiring further reports from the public administrators and even, as a stopgap measure, directly supervising the operations of the Kings County office during a vacancy in the position of Public Administrator in 2008. However, this cannot substitute for direct and regular supervision of this agency by the City itself.